**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　*Plaintiff,*<br><br>　　　v.<br><br>LESLIE MORRIS,<br>　　　*Defendant.* | No. 3:99-cr-264-17 (VAB) |

**RULING AND ORDER ON EMERGENCY MOTION**
**FOR REDUCTION IN SENTENCE UNDER THE FIRST STEP ACT**

Leslie Morris ("Defendant") moves for reduction of sentence under Section 603 of the First Step Act. *See* Emergency Mot. for Reduction in Sentence Under the First Step Act, ECF No. 2737 (Sept. 14, 2021) ("Def.'s Mot."); *see also* Mem. in Support of Mot. for Reduction in Sentence Under the First Step Act, ECF No. 2738 (Sept. 14, 2021) ("Def.'s Mem."). Currently, Mr. Morris is serving four concurrent life sentences of imprisonment, *see* J., ECF No. 1502 (Sept. 15, 2003) ("Judgment"), and is incarcerated at Beaumont Federal Correctional Complex, in Beaumont, Texas. *See* Government's Opp'n to Def.'s Mot. for Sentence Reduction Under the First Step Act at 4, ECF No. 2744 (Oct. 15, 2021) ("Gov't Opp'n").

The United States of America (the "Government") opposes Mr. Morris's motion. Gov't Opp'n.

On December 22, 2021, the Court held a hearing on the motion. Min. Entry, ECF No. 2765 (Dec. 22, 2021).

For the reasons explained below, the Court (1) **GRANTS** the motion for sentence reduction under the First Step Act; (2) **ORDERS** that Mr. Morris's sentence of incarceration be

**REDUCED** to **360 months**; and (3) **RE-IMPOSES** a term of supervised release of **FIVE (5)**

**YEARS**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Because of his involvement with an extensive and violent drug trafficking enterprise in

Bridgeport, Connecticut, *see* Gov't Opp'n. at 1–2, Mr. Morris has been in federal custody for

about twenty-three years, *see* Def.'s Mem. at 53 n.43 (noting that "[M]r. Morris was arrested for

Kenneth Porter's murder by state authorities over 22 years ago, on May 19, 1999").

On December 20, 2001, a federal grand jury indicted Mr. Morris and other alleged

members of the drug trafficking enterprise on various conspiracy charges, violent crimes, and

drug charges. *See* Fifth Superseding Indictment, ECF No. 813 (Dec. 20, 2001).

On November 20, 2002, a hung jury returned no charge against Mr. Morris and his co-

defendants. *See* Trial Tr., ECF No. 1278 (Dec. 18, 2002).

On April 24, 2003, after a seven-week trial in the United States District Court for the

District of Connecticut before the Honorable Peter C. Dorsey, a jury convicted Mr. Morris of

violating 18 U.S.C. § 1962(c), Racketeering in Corrupt Organizations ("RICO") (Count One); 18

U.S.C. § 1962(d), RICO Conspiracy (Count Two); 18 U.S.C. §§ 841 and 846, Conspiracy to

Possess with Intent to Distribute and Distribution of Narcotics (Count Five); 18 U.S.C. §

1956(a)(1), Conspiracy to Commit Money Laundering (Count Thirteen); 18 U.S.C. § 1959(a)(1)

and (2), Violent Crimes in Aid of Racketeering Act ("VICAR"): Murder of Kenneth Porter

(Count Fourteen); and 18 U.S.C. § 924(c)(1) and (2), Use of Firearm in Relation to Murder of

Kenneth Porter (Count Fifteen). Verdict Form, ECF No. 1408 (Apr. 24, 2003).

On May 2, 2003, Mr. Morris moved for judgment of acquittal. Mot. by Leslie Morris for J. of Acquittal, ECF No. 1412 (May 2, 2003). Judge Dorsey denied this motion on September 3, 2003. Ruling, ECF No. 1485 (Sept. 3, 2003).

On September 15, 2003, Judge Dorsey sentenced Mr. Morris to life imprisonment terms on Counts One, Two, Five, and Fourteen; ten years imprisonment on Count Thirteen; and five years imprisonment on Count Fifteen. *See* Judgment. The terms of imprisonment were to all run concurrently with each other, except the five-year term, which was to run consecutive with the other terms. *Id.* Judge Dorsey also ordered a three-year term of supervised release on Count Thirteen and a five-year term of supervised release on Count Fifteen, to run concurrently. *Id.*

On September 18, 2003, Mr. Morris appealed his conviction. Notice of Appeal, ECF No. 1506 (Sept. 18, 2003). On October 20, 2008, the Second Circuit Court of Appeals denied the appeal and affirmed the judgment of the district court. *See United States v. Jones*, 296 F. App'x 179, 180 (2d Cir. 2008) (summary order) ("All defendants challenge the sufficiency of the evidence underlying their convictions, but we see no merit in any of their challenges.").

On September 28, 2009, Mr. Morris filed a writ of habeas corpus seeking to vacate his sentence pursuant to 28 U.S.C. § 2255. *See* Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, *Morris v. United States*, 3:09-CV-1548 (PCD), ECF No. 2 (Sept. 28, 2009). On March 22, 2010, the Government opposed Mr. Morris's writ. Government's Resp. to Petitioner's Mot. Pursuant to 28 U.S.C. § 2255, *Morris v. United States*, 3:09-CV-1548 (PCD), ECF No. 9 (Mar. 22, 20210). On May 16, 2011, Judge Dorsey denied Mr. Morris's petition. Ruling on Petition for Habeas Corpus, *Morris v. United States*, 3:09-CV-1548 (PCD), ECF No. 15 (May 16, 2011).

On June 9, 2011, Mr. Morris appealed Judge Dorsey's denial of his habeas petition. *See* Notice of Appeal, *Morris v. United States*, 3:09-CV-1548 (PCD), ECF No. 17 (June 9, 2011). On June 19, 2013, the Second Circuit affirmed Judge Dorsey's denial and denied Mr. Morris's petition for rehearing. *See Morris v. United States*, 523 F. App'x 7, 9 (Mem.), No. 11-2369 (2d Cir. 2013) (summary order) (affirming the lower court's decision).

On December 21, 2018, Congress passed, and the President of the United States, Donald J. Trump, signed into law, the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (hereinafter, the "First Step Act"), which "made retroactive some provisions of the Fair Sentencing Act [of 2010, Pub. L. 111-220; 124 Stat. 2372]." *United States v. Bobby Medina*, No. 3:05-cr-58, 2019 WL 3769598, at *2 (D. Conn. July 17, 2019).

On October 15, 2020, Mr. Morris moved in the Second Circuit for an order authorizing this Court to consider a successive 28 U.S.C. § 2255 motion on Eight Amendment grounds. The Second Circuit granted this motion on November 9, 2020. Mandate, ECF No. 2705 (Nov. 9, 2020). Mr. Morris also requested leave to file a claim under the First Step Act, which the Second Circuit denied as unnecessary, since such motions could be filed with this Court in the first instance, without leave. *Id.*

On September 14, 2021, Mr. Morris moved for a sentence reduction pursuant to Section 603 of the First Step Act. Def.'s Mot.

On October 15, 2021, the Government filed an opposition to Mr. Morris's motion for a sentence reduction. Gov't Opp'n.

On October 29, 2021, Mr. Morris filed a reply in support of his First Step Act motion. Reply in Supp. of First Step Act Mot., ECF No. 2751 (Oct. 29, 2021) ("Reply").

On November 15, 2021, the Government filed a supplemental opposition to Mr. Morris's motion for a sentence reduction. Government's Suppl. Opposition to Def.'s Mot. for a Sentence Reduction Under the First Step Act, ECF No. 2758 (Nov. 15, 2021) ("Gov't Suppl. Opp'n").

On December 22, 2021, the Court held a motion hearing. Min. Entry, ECF No. 2765 (Dec. 22, 2021).

## II.  STANDARD OF REVIEW

A court may modify a term of imprisonment on compassionate release grounds in two circumstances: (1) "upon motion of the Director of the Bureau of Prisons [("BOP")];" or (2) "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020) ("In December 2018, as part of the First Step Act, Congress worked a change to th[e] rule of long standing" that a court could only modify a sentence upon motion from the Bureau of Prisons. "A court may now consider a motion for compassionate release made by a defendant who has exhausted his administrative remedies by petitioning the Director of the BOP to make such a motion, assuming the Director fails to act on the inmate's request within thirty days.").

A court may only grant such a modification if it finds that "extraordinary and compelling reasons warrant" release. 18 U.S.C. § 3582(c)(1)(A). In determining whether to grant a motion to modify a sentence, a court must also consider the factors set forth in 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c)(1)(A).

A district court may, after considering the factors set forth in § 3553(a) "such as deterrence, public safety, rehabilitation, proportionality, and consistency," *United States v. Lussier*, 104 F.3d 32, 35 (2d Cir. 1997), "'terminate a term of supervised release . . . at any time after the expiration of one year of supervised release,' so long as 'it is satisfied that such action is warranted by the conduct of the defendant . . . and the interest of justice," *United States v. Key*, 602 F.3d 492, 494 (2d Cir. 2010) (quoting 18 U.S.C. § 3583(e)(1)). "The district court is not required to make specific findings of fact with respect to each § 3553(a) factor; instead, 'a statement that the district court has considered the statutory factors is sufficient.'" *United States v. Shellef*, No. 03-CR-0723 (JFB), 2018 WL 3199249, at *1 (E.D.N.Y. Jan. 9, 2018) (quoting *United States v. Gammarano*, 321 F.3d 311, 315–16 (2d Cir. 2003)).

"Before modifying the conditions of probation or supervised release, the court must hold a hearing, at which the person has the right to counsel and an opportunity to make a statement and present any information in mitigation." Fed. R. Crim P. 32.1(c)(1). A hearing is not required, however, "if . . . (B) the relief sought is favorable to the person and does not extend the term of probation or of supervised release; and (C) an attorney for the government has received notice of the relief sought, has had a reasonable opportunity to object, and has not done so." Fed. R. Crim P. 32.1(c)(2).

"Courts in the Second Circuit have made clear that '[e]arly termination is not warranted as a matter of course.'" *United States v. Lewis*, No. 13-CR-487 (CBA), 2020 WL 1275233, at *1 (E.D.N.Y. Mar. 17, 2020) (quoting *United States v. Sheckley*, 129 F.3d 114, 1997 WL 701370 (TABLE), at *1 (2d Cir. 1997)). Rather, early termination is warranted "[o]ccasionally," where

> changed circumstances—for instance, exceptionally good behavior
> by the defendant or a downward turn in the defendant's ability to
> pay a fine or restitution imposed as conditions of release—[ ] render
> a previously imposed term or condition of release either too harsh

> or inappropriately tailored to serve the general punishment goals of section 3553(a).

*Shellef*, 2018 WL 3199249, at *1 (quoting *Lussier*, 104 F.3d at 36). "Thus, because 'full compliance with the terms of supervised release is what is expected of a person under the magnifying glass of supervised release,' such compliance 'does not warrant early termination.'" *Id.* (quoting *United States v. Fenza*, No. CR 03-0921 (ADS), 2013 WL 3990914, at *2 (E.D.N.Y. Aug. 2, 2013)). Section 3583(e)(2) "authorizes the court to modify the conditions of supervised release only when general punishment goals would be better served by a modification." *Lussier*, 104 F.3d at 35.

Ultimately, however, "[t]he decision whether to grant early termination rests within the discretion of the district court." *United States v. Trotter*, 321 F. Supp. 3d 337, 359 (E.D.N.Y. 2018) (quoting *United States v. Harris*, 689 F. Supp. 2d 692, 694 (S.D.N.Y. 2010)); *see also Sheckley*, 1997 WL 701370, at *1 ("We have explained that the determination of early release is a discretionary decision made by the district court." (internal citation omitted)).

## III.    DISCUSSION

Section 3582(c)(1)(A) authorizes courts "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *see United States v. Gonzalez*, No. 3:15-cr-00223 (MPS), 2020 WL 5793304, at *1 (D. Conn. Sept. 29, 2020) (slip op.) ("[B]ecause [Mr.] Gonzalez—and not the [BOP]—brings the instant motion, [the Court is] not bound by the Sentencing Commission's outdated policy statement applicable to Section 3582(c)(1)(A) . . . , which the

Second Circuit recognized as only applying to motions for sentence reduction brought by the BOP." (citing *Brooker*, 976 F.3d at 230)).

Mr. Morris argues that extraordinary and compelling reasons exist for his release. Specifically, he claims that his age at the time of the offense, his "unusually" long sentence, his rehabilitation, his vulnerability to COVID-19, the harsh conditions of confinement created by the pandemic, and his immediate family members' serious medical conditions constitute extraordinary and compelling reasons for release.

The Government argues that even if Mr. Morris could demonstrate extraordinary and compelling reasons for a sentence reduction, the Section 3553(a) factors weigh against such a reduction. Gov't Opp'n at 1. As to the 18 U.S.C. § 3553(a) factors, Mr. Morris argues that a sentence of time served is sufficient "to reflect the seriousness of [his] offense, promote respect for the law, and promote just punishment." Def.'s Mem. at 96–99 (citing *United States v. Ramsay*, 538 F. Supp. 3d 407 (S.D.N.Y. 2021); *United States v. Cruz*, No. 3:94-CR-112 (JCH), 2021 WL 1326851 (D. Conn. Apr. 9, 2021); *United States v. Perez*, No. 3:02-CR-7, 2021 WL 837425 (D. Conn. Mar. 4, 2021)).

Mr. Morris acknowledges that he "earned his last two serious tickets—assault with serious injury and possessing a dangerous weapon—while incarcerated at USP Hazelton in 2009 and 2008, respectively." *Id.* at 47 He argues that the Court should consider these two instances "in context," meaning in light of "USP Hazelton [being] among the most violent federal prisons in the country" and being "overcrowded for years, a factor that is correlated with increased violence." *Id.* at 48. He claims that other courts have found it "common to accumulate disciplinary tickets while serving lengthy sentences in federal prison. *Id.* at 50 (citing to *Cruz*, 2021 WL 1326851, at *13).

As to Mr. Morris's alleged "vulnerability to COVID-19," he notes that of the "4,729 prisoners at Beaumont FCC . . . only 2,852 (60%) have been fully vaccinated," and that "prisons . . . impose on residents an increased risk of contracting COVID-19." *Id.* at 77–78, 87. He claims to "'largely lack[] the means to take self-protective measures like social distancing and timely COVID-19 testing.'" *Id.* at 87 (quoting *Perez*, 2021 WL 837425, at *3). He also claims to be "especially vulnerable to both the Alpha and Delta strains of COVID-19 because he is a former smoker and has a family history of heart disease." *Id.* at 83. Mr. Morris argues that "[n]umerous courts have recognized that the increased risk of severe COVID complications caused by smoking may constitute an extraordinary and compelling reason supporting sentence modification." *Id.* at 83–84 (citing *United States v. McBriarty*, No. 3:16-CR-109 (SRU), 2021 WL 1648479, at *6 (D. Conn. Apr. 27, 2021); *Cruz*, 2021 WL 1268253 at *5; *United States v. Davila*, No. 3:02-CR-258 (MPS), 2021 WL 423284 at *5 (D. Conn. Feb. 8, 2021); *United States v. Brunstorff*, No. 3:13-CR-00004 (MPS), 2020 WL 6110961 at *2 (D. Conn. Oct. 16, 2020)). He also notes that "courts have granted compassionate release to individuals with heart disease." *Id.* at 84 (citing *United States v. Berrios*, 04-CR-0604 (JS), 2021 WL 200511, at *2 (E.D.N.Y. Jan. 20, 2021)).

Finally, Mr. Morris argues that "district courts have followed Congress's instruction to increase the use of compassionate release by finding extraordinary and compelling reasons for a reduction in a broader range of family health circumstances than those contained in the Guideline's narrow definition of that term." *Id.* at 92–93 (emphasis omitted) (internal quotations omitted) (citing *Cruz*, 2021 WL 1326851, at *10; *United States v. Wooten*, No. 3:13-CR-18 (SRU), 2020 WL 6119321, at *7–8 (D. Conn. Oct. 16, 2020)). Specifically, Mr. Morris notes that "[f]ive members of [his] immediate family have concerning medical conditions," and that

"[w]hile [he] 'would not be the only available caregiver' for these family members, his presence surely 'could assist [them] in a way that no other person currently can.'" *Id.* at 93 (quoting *Cruz*, 2021 WL 1326851, at *10).

Mr. Morris notes that "[e]ven if [his] sentence in this case is reduced to time served, he will have to serve the consecutive 24-month sentence imposed in the case stemming from a disciplinary infraction at USP Hazelton . . . ." *Id.* at 96. In any event, he says, "[w]hile a sentence of time served is most appropriate, it is clear that 18 U.S.C. § 3582(c)(1)(A)(i) 'allows for any sentence reduction—up to and including but not limited to time served.'" *Id.* at 96 (emphasis omitted) (quoting *United States v. Rodriguez*, 492 F. Supp. 3d 306, 309 (S.D.N.Y. 2020)).

The Court will address each of the relevant factors in turn.

## A. Exhaustion

Normally, under 18 U.S.C. § 3582(c)(1)(A), a court may not modify or reduce a defendant's sentence on that defendant's motion when the defendant has not exhausted his administrative remedies by either (1) appealing a failure of the BOP to bring such a motion on the defendant's behalf or (2) the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility.

The parties do not dispute that the exhaustion requirement has been met. *See* Def.'s Mem. at 56; Gov't Opp'n at 11. On March 9, 2021, Mr. Morris, through his counsel, submitted a request for compassionate release to the Warden at USP Beaumont. Ex. Y to Def.'s Mem., ECF No. 2738-25 (Sept. 14, 2021). More than thirty days have passed since this request was filed. Def.'s Mem. at 56; Gov't Opp'n at 11. As more than thirty days have passed since Mr. Morris submitted his request to the Warden, the exhaustion requirement has been satisfied and Mr. Morris's motion is properly before the Court.

### B. Extraordinary and Compelling Reasons

With respect to "extraordinary and compelling reasons," Mr. Morris moves the Court to grant his motion because,

> extraordinary and compelling reasons warrant a reduction in his sentence, particularly his age at the time of the offense, the unusual length of his sentence, his demonstrated record of rehabilitation, his vulnerability to COVID-19, the exceptionally harsh conditions of confinement occasioned by the ongoing pandemic, and his family's medical conditions.

Def.'s Mem. at 7. Mr. Morris argues that "Section 603 of the First Step Act allows individuals to petition to the Court for reduced sentences under 18 U.S.C. § 3582(c)(1)(A) on the grounds that extraordinary and compelling reasons merit such a reduction, removing any requirement that any such motion be initiated by the Bureau of Prisons." *Id.* at 7–8. Mr. Morris argues that "[a] sentence of time served . . . is appropriate under the 18 U.S.C. § 3553(a) sentencing factors," which "the Court must also consider . . . to determine whether they also support a sentence reduction." *Id.* at 96.

With respect to his age at the time of the offense, Mr. Morris notes that he "experienced persistent poverty and housing instability throughout his childhood," which "can have lasting impacts on brain development that affect a person's decision-making processes long term," *id.* at 9–10; that he "was frequently unsupervised as a young child," which affects "brain development[;] the ability to make decisions as carefully as one's peers[;] the ability to regulate physiology, behavior, and emotion[;] and the trajectory toward more problematic outcomes," *id.* at 13 (internal citation and quotation marks omitted); that he attended "under-resourced schools [that] failed to address his academic struggles," *id.* at 14; that he was "a frequent target of bullying throughout his childhood and adolescence," *id.* at 16; that he "witnessed relentless violence, both in his community generally and within close circles of friends and family," *id.* at

19; that "[l]acking alternative role models, [he] followed in the footsteps of the men who looked out for him (and whom he admired) and began selling drugs at a young age," *id.* at 23; that he became a father at a young age and, "[o]verwhelmed by the immense financial responsibility of caring for a young family, . . . began selling drugs more regularly," *id.* at 25–26; and that "[a]fter he began selling at P.T. Barnum, Mr. Morris was exposed to a new level of violence and felt anxious to prove himself, in order to protect his reputation and his earnings," *id.* at 26. At P.T. Barnum, Mr. Morris sold drugs and murdered Kenneth Porter after Mr. Porter allegedly "snatched" money that Mr. Morris had rightly won in a game of dice. *Id.* at 27 (internal citation and quotation marks omitted).

According to Mr. Morris, he was pressured by Willie Nunley, "a lieutenant in the drug-selling business at P.T. Barnum and thus [someone in] a position of authority over Mr. Morris," to "get the money back from [Mr.] Porter" and that if he did not "do [Mr. Porter], [Mr. Nunley would] do [Mr. Morris]." *Id.* at 27–28. "After attempting to resolve the dispute with words, Mr. Morris made the deeply regrettable decision to listen to Mr. Nunley and the other peers pressuring him to respond to this humiliation with violence, rather than to those encouraging him to walk away." *Id.* at 29.

Mr. Morris argues that "the Supreme Court has recognized several characteristics that distinguish juveniles from adults in terms of blameworthiness." *Id.* at 58–59 (citing *Miller v. Alabama*, 567 U.S. 460 (2012) and *Roper v. Simmons*, 543 U.S. 551 (2005)). He further notes that in *Brooker*, 976 F.3d at 235, 236, the Second Circuit "suggested that on remand, the defendant's rehabilitation, in combination with his 'age at the time of his crime and the injustice of his lengthy sentence,' might 'perhaps weigh in favor of a sentence reduction.'" *Id.* at 55 (quoting *Brooker*, 976 F.3d at 238). As a result, he argues, "Section 603 permits this Court to

consider Mr. Morris'[s] age at the time of offense for the first time, as other courts in this circuit have done for adolescent defendants over the age of 18." *Id.* at 59. In support, Mr. Morris cites to *United States v. Cruz*, where Judge Janet C. Hall "recently stated that '[i]t is uncontroversial that age, specifically youth, bears on an individual's blameworthiness in committing a criminal offense'" *Id.* at 60 (quoting *Cruz*, 2021 WL 1326851, at *5). Mr. Morris notes that "Judge Hall held that [the defendant therefore] 'was less than fully blameworthy for his crimes given his age when he committed them.'" *Id.* (quoting *Cruz*, 2021 WL 1326851, at *7). Likewise, Mr. Morris says, Judge Rakoff, in *United States v. Ramsay*, "held both that [an offender's youth, combined with society's evolving understanding of the adolescent brain] can constitute an extraordinary and compelling reason under the First Step Act and that [the defendant's] youth, in combination with other factors, warranted a reduction in his sentence." *Id.* at 61 (citing *Ramsay*, 538 F. Supp. 3d at 410).

With regard to the length of his sentence, Mr. Morris notes that "[a]lthough [he] received four life sentences, his convictions involved only one death," and that "[t]hree of the life sentences were solely related to drug trafficking and his role in the conspiracy; the fourth was for the murder of Kenneth Porter." *Id.* at 52. Furthermore, Mr. Morris argues, "Judge Dorsey did not have any discretion, as Mr. Morris's [VICAR] murder conviction carried a mandatory life sentence." *Id.* Mr. Morris also cites to *Brooker* for the proposition that "[t]he Second Circuit has held that district courts may consider the length of a sentence in deciding whether extraordinary and compelling circumstances are present." *Id.* at 72 (citing *Brooker*, 976 F.3d at 238).

Mr. Morris argues that "[w]hile rehabilitation alone cannot support a reduction in sentence, it may be considered in conjunction with other reasons." *Id.* at 76 (citing *Cruz*, 2021 WL 1326851, at *8). As to his alleged record of rehabilitation, Mr. Morris claims that his

"acceptance of responsibility and emphatic declaration of remorse is evidence of his rehabilitation after over 25 years . . . in prison." *Id.* at 35. He also notes having "participated in at least 72 classes and programs" while in prison, which he says is "especially notable given that he was not required to participate in any of them and had no 'tangible incentive other than self-improvement, given that his life sentence meant he could neither earn any good time nor receive any other sentence reduction benefit.'" *Id.* (quoting *Rodriguez*, 492 F. Supp. 3d at 313). Mr. Morris is also currently participating in the Challenge Program, which he notes other courts in this District have considered "'particularly noteworthy.'" *Id.* at 38 (citing *Cruz*, 2021 WL 1326851, at *13). Mr. Morris claims also to have "positively impacted other people in BOP custody" and "mentored several young men from his family and community throughout his time in prison." *Id.* at 40–41, 43–44.

While in BOP custody, Mr. Morris has worked in laundry, as a suicide companion, as a basketball referee, as an orderly, managing a hot bar in the kitchen, preparing lunch and dinner, and, most recently, in maintenance. *Id.* at 41–42. Mr. Morris notes that he has also been "trusted" by BOP staff "with suicide watch," a "high-stakes position that involves sitting with people in the hospital wing who have either attempted or are at imminent risk of suicide." *Id.* at 42. While incarcerated, Mr. Morris's family have noted that he has "work[ed] to preserve cherished family ties despite serving a life sentence hundreds of miles from his loved ones," and his family and friends alike "have noted his growth during his time in prison." *Id.* at 45–47. Finally, Mr. Morris argues that "[t]he downward trajectory of [his] disciplinary tickets illustrates his tremendous growth during the past decade of his incarceration." *Id.* at 47. He notes that he "has not received a single disciplinary ticket in 7 years" and "has only received 11 disciplinary tickets during his

25 years . . . in prison," with "[the] majority of his disciplinary infractions [being] minor." *Id.* at 47.

The Government opposes Mr. Morris's motion. Gov't Opp'n.

The Government argues first that "[Mr.] Morris's age at the time of his offense is not an 'extraordinary and compelling' reason for a sentence reduction, nor is it 'extraordinary and compelling' that [Mr.] Morris received the type of significant sentence that adults face for such serious crimes." *Id.* at 14. According to the Government, "[w]hile a defendant's youth, along with a defendant's lack of maturity or emotional/cognitive development, may be a consideration for sentencing, [Mr.] Morris's age at the time of his offense is neither an extraordinary nor compelling reason for a sentence reduction." *Id.* at 11. In support, the Government highlights that "[t]he Supreme Court has repeatedly drawn a bright line at age eighteen for Eight Amendment limitations on sentencing, recognizing that '[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood.'" *Id.* at 11–12 (quoting *Graham v. Florida*, 560 U.S. 48, 74 (2010); citing *United States v. Sierra*, 933 F.3d 95, 97 (2d Cir. 2019)). "Thus, following the Supreme Court and this Circuit's guidance, this Court must still draw the line at eighteen years of age." *Id.* at 13 (citing *United States v. Reingold*, 731 F.3d 204, 215 (2d Cir. 2013) for the proposition that "while a defendant's maturity is relevant to sentencing, courts may not 'substitute the defendant's relative immaturity for the actual age of minority'").

The Government notes also that "[Mr.] Morris was convicted of multiple counts including [VICAR] murder, which carries a mandatory sentence of death or life imprisonment" under 18 U.S.C. § 1959(a)(1), and which "have been upheld even for defendants in their 'late adolescence,' similar to [Mr.] Morris." *Id.* (citing *United States v. Smith*, 823 F. App'x 34, 39 (2d Cir. 2020); *United States v. Frank*, 832 F. App'x 764, 765 (2d Cir. 2021); *Sierra*, 933 F.3d at

99). The Government also cites to *Gonzalez*, where Judge Hall "found that [the defendant's] age at the time of his offense, 24 years old, did not support a finding of extraordinary and compelling circumstances given his proximity to the age of full maturity at the time of his crimes." *Id.* at 18 (citing *United States v. Gonzalez*, No. 3:97-CR-204 (JCH), 2021 WL 1990041, at *4 (D. Conn. Apr. 23, 2021)).

As to the length of Mr. Morris's sentence, the Government argues that "[w]hile [it] does not dispute that the Court may consider the length of [Mr.] Morris's sentence in determining whether he has established an extraordinary and compelling reason for a sentence reduction, it submits that [Mr.] Morris's sentence alone does not militate in favor of a reduction." *Id.* at 14. In support, the Government notes that Mr. Morris's "conviction for V[I]CAR murder is among the most serious of all federal offenses and today still carries a mandatory minimum sentence of life imprisonment." *Id.*

The Government also argues that "on balance, [Mr.] Morris's rehabilitation does not justify a sentence reduction of time served." *Id.* at 15. "Congress has decided that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason' in a motion under § 3582(c)." *Id.* at 15 (quoting 28 U.S.C. § 994(t)). In weighing Mr. Morris's rehabilitation "against other factors, including his prior disciplinary citations and the seriousness of his offenses," the Government submits that the Court consider Mr. Morris's twelve infractions in federal prison between May 19, 1999 and April 27, 2017. *Id.* at 14–15. "Most seriously, [Mr.] Morris admitted to stabbing another inmate multiple times with a homemade weapon, causing serious injury." *Id.* at 15. The Government further argues that though the last infraction occurred in 2017, "[m]erely avoiding serious trouble in prison is not a reason for a revised sentence— indeed, it is an expectation." *Id.* at 16 (citing *United States v. Mumuni*, 946 F.3d 97, 112 (2d Cir.

2019)). The Government finally notes that Judge Hall's opinion in *Cruz*, which "relied in part on [Mr.] Cruz's rehabilitation in prison as a basis for reducing his sentence," is distinguishable because "[Mr.] Cruz *never* received a disciplinary ticket in more than 26 years in BOP custody—a record which Judge Hall determined was remarkable in the Court's experience." *Id.* at 16.

The Government also points to *Gonzalez* and *United States v. Morales*, No. 3:94-cr-112 (SRU), 2020 WL 4926609, at *1 (D. Conn. Aug. 20, 2021) to argue that a sentence reduction because of COVID-19 does not constitute an extraordinary and compelling circumstances. In *Gonzalez*, the Government notes, Judge Hall determined that the defendant's "vaccination status mitigated his risk of severe illness and therefore his health conditions were no longer extraordinary and compelling circumstances warranting release." *Id.* at 17–18 (citing *Gonzalez*, 2021 WL 1990041, at *3). In *Morales*, the Government notes, Judge Stefan Underhill "determined that defendant was obese and had Type 2 diabetes, which were extraordinary and compelling reasons authorizing release," but "[n]evertheless . . . rejected defendant's motion for a reduced sentence, finding that [the defendant] had 'committed the most serious kind of crime—murder.'" *Id.* at 19 (quoting *Morales*, 2020 WL 4926609, at *3).

As to Mr. Morris's current family circumstances, the Government argues that "[w]hile the incapacitation and need to care for an immediate family member may contribute to extraordinary and compelling reasons, the need to care for a family member when alternative care is available does not alone justify release." *Id.* at 27 (citing *McBriarty*, 2021 WL 1648479, at *8; *United States v. Poupart*, No. 3:11-CR-116 (JBA), 2021 WL 917067, at *1 (D. Conn. Mar. 10, 2021); *Wooten*, 2020 WL 6119321, at *8). The Government argues that Mr. Morris concedes he is not the only available caregiver and that he has "not provided any documentation or

evidentiary basis . . . to support his statement as to the nature or severity of his family members'

health conditions, or their need for assistance beyond the care they currently receive." *Id.* at 28.

In his reply, Mr. Morris notes that he is not making a constitutional claim as to his age at

the time of his crime, and again notes that many courts have found age to be an extraordinary

and compelling reason warranting relief. Reply at 16–17. As to his disciplinary record while in

prison, he argues that neither § 3582 nor the case law bars relief for individuals with serious

disciplinary histories, and that he has "achieved extraordinary rehabilitation in spite of and

perhaps in part because of the 2009 incident." *Id.* at 18; 30–37.

Several courts in this Circuit, he notes, have provided relief where defendants had

incurred as many as fifteen disciplinary actions, including infractions that involved violence. *Id.*

at 19–22. Despite the disciplinary issue, Mr. Morris has taken responsibility for killing Kenneth

Porter, has completed 72 classes and programs, is participating in a residential program based on

cognitive behavioral and restorative justice principles, has been consistently employed, has

mentored young men from his family and community, and has worked to maintain family ties

during his imprisonment. *Id.* at 23–24. Therefore, he argues, there are extraordinary and

compelling reasons warranting a sentence reduction.

Overall, the Court agrees.

The Court finds that Mr. Morris's age when the crime was committed and his

rehabilitation present extraordinary and compelling reasons warranting a sentence reduction.

The applicable characteristics of late adolescence that Mr. Morris flags for the Court—

hot cognition, poor impulse control, and susceptibility to peer pressure—have been recognized in

this Circuit. *Cruz*, 2021 WL 1326851, at *5 ("Because of their reduced cognitive, interpersonal,

and emotional capabilities, children and adolescents are less blameworthy than mature adults

when they engage in criminal behavior."); *Ramsay*, 538 F. Supp. 3d at 417–23 (enumerating the

"hallmark[s] of adolescence that sentencing courts should consider," including immaturity,

"susceptibility to negative influences and outside pressures, including peer pressure"").

Adolescence, of course, is not an excuse for engaging in criminal behavior. But as courts in this

Circuit, including the Second Circuit, have recognized: "age at the time of [the] crime . . . might

perhaps weigh in favor of a sentence reduction." *Brooker*, 976 F.3d at 238.

      The *Miller* decision is inapposite, as Mr. Morris is not raising a constitutional argument,

but rather is asking the Court to consider his age at the time the crime was committed when

deciding whether to reduce his sentence. Nor is *Gonzalez* applicable, as the 24-year-old

defendant in that case was found by Judge Hall to be "on the very cusp" of late adolescence.

2021 WL 1990041, at *4. Judge Hall recognized both points in *Cruz*.

> [T]hat the Supreme Court has drawn this line at age 18 for purposes
> of the Eighth Amendment does not extinguish the relevance of these
> characteristics in assessing, as a general matter, an 18-year-old's
> blameworthiness in committing a crime. Certainly, it does not
> require that this court ignore . . . what is plain: a person 20 weeks
> past his eighteenth birthday exhibits the same hallmark
> characteristics of youth that make those under 18 less blameworthy
> for criminal conduct than adults.

2021 WL 1326851, at *5. Indeed, Mr. Morris was just 25 weeks over 18 at the time of the

applicable offense.

      The Court also finds that Mr. Morris has demonstrated rehabilitation while in prison,

especially since 2017 through his participation in classes and programs, his development of

conflict resolution skills, and the trust he has earned from staff, fellow prisoners, and others in

his community. Though, as the Government notes, *Cruz* entailed a "remarkable" disciplinary

record, Judge Hall in that case did note that it "is not uncommon for an inmate to have a good

record with the BOP, but there are almost always a few violations along the way." *Cruz*, 2021

WL 1326851, at *8. And as Mr. Morris notes, a disciplinary record while in prison is not a strict bar to obtaining relief under the First Step Act.

Mr. Morris's age, along with the rehabilitation he has demonstrated, as well as the Court's consideration of the § 3553(a) factors, merit a sentence reduction.

### C. Section 3553(a) Factors

After establishing that extraordinary and compelling reasons exist, "Section 1B1.13 of the Guidelines further provides that a court may reduce a term of imprisonment only if the court determines that '[t]he defendant is not a danger to the safety of any other person or to the community[,]'[ ] and only after considering the factors set for[th] in [18 U.S.C. § 3553(a)]." *United States v. McCarthy*, 453 F. Supp. 3d 520, 527–28 (D. Conn. 2020) (quoting U.S.S.G. § 1B1.13(3)).

While he acknowledges that "the murder of Kenneth Porter is, without a doubt, an extremely serious offense[,]" Mr. Morris also notes that "[a] reduction from life to a term of years is appropriate and precedented in the context of First Step Act cases, including cases that involved murders." Def.'s Mem. at 97–98 (citing *Ramsay*, 538 F. Supp. 3d 407; *Cruz*, 2021 WL 1326851; *Perez*, 2021 WL 837425; *United States v. Luna*, 436 F. Supp. 3d 478 (D. Conn. 2020); *Rodriguez*, 492 F. Supp. 3d 306; *United States v. Rios*, No. 3:94-CR-112 (JBA), 2020 WL 7246440 (D. Conn. Dec. 8, 2020)).

Mr. Morris notes that "[t]he over-306-month sentence [he] has served already exceeds the average sentence for murder." *Id.* at 98. Moreover, Mr. Morris says, his "impulsive shooting of Mr. Porter, which the trial record establishes he did under pressure from Willie Nunley and others, is a far cry from the 'act of torture and violence designed to send a dangerous message that cooperation with law enforcement would be brutally punished.'" *Id.* at 98–99 (quoting

*Rodriguez*, 492 F. Supp. 3d at 315 (reducing a life sentence, in the case of an individual who

murdered a government informant, to thirty years)). Comparing his sentence to others who were

also dealing drugs in P.T. Barnum, Mr. Morris notes that he, "a lowly 'pack-boy,' remains

incarcerated while nearly all of his co-defendants have received sentence reductions." *Id.* at 99.

Specifically, he notes that Luke Jones, whose "case involved multiple murders," had his sentence

"reduced to 450 months, yet Mr. Morris is still serving a life sentence." *Id.* at 107–08.

Mr. Morris emphasizes again that his personal history and characteristics, both at the time

of the offense and now, support the § 3553 factors. He emphasizes that "the Court has never

been able to consider these critical factors because of the mandatory nature of [his] life sentence

at the time of his sentencing hearing." *Id.* at 100. In addition to his personal history and

characteristics, Mr. Morris encourages the Court to consider his rehabilitation since the offense,

including his educational and vocational training and correctional treatment. *Id.* at 100–01.

In response, the Government argues that the nature and circumstances of his crime were

very serious and that the killing of another human should be punished severely. Gov't Opp'n. at

30 (citing *Gonzalez*, 2021 WL 1990041, at *5). Moreover, the quantity of the narcotics he

supplied "was substantial and adversely affected the lives of many people and their

communities." *Id.* at 32 (citing *United States v. Howell*, No. 3:17-CR-151 (SRU), 2021 WL

2400253, at *2 (D. Conn. June 11, 2021)).

Nor are his history and characteristics a basis for a sentence reduction, the Government

argues, because the difficult circumstances he faced in his youth are not extraordinary and

compelling. What makes Mr. Morris's case exceptional is that he turned to violent crime and

drug trafficking in the face of his significant difficulties and despite having a loving family. *Id.* at

32–33. This habit of resorting to violence, the Government says, has continued in prison, where

Mr. Morris was convicted of assaulting another inmate with a dangerous weapon with intent to do bodily harm. *Id.* at 34.

As to the goals of sentencing, the Government notes that even if the crime had been committed in 2021, Mr. Morris would have faced a statutorily mandated sentence of life imprisonment, thus demonstrating that the sentence of life imprisonment was sufficient but not greater than necessary to accomplish the purposes of the § 3553(a) factors. *Id.*

The Government concedes that other courts in the District of Connecticut have reduced mandatory life sentences and sentences of defendants convicted of murder offenses, *id.* at 34 (citing *Cruz*, 2021 WL 1326851), but notes that other courts have also denied similar motions, *id.* (citing *Gonzalez*, 2021 WL 1990041; *Morales*, 2020 WL 4926609, at \*1). The Government also argues that while Mr. Morris may have had a relatively minor role in the Middle Court enterprise as compared to his co-defendants, none of those who have been resentenced to time served were convicted of murder. *Id.* at 35.

The closest comparisons, it argues, are Luke Jones, who was found guilty of VICAR conspiracy to commit murder and was resentenced to 450 months, and Willie Nunley, who was also found guilty of VICAR conspiracy to commit murder and VICAR murder and has not sought nor received a sentence reduction to his life sentence. *Id.* at 35–36. As to Luke Jones, the Government concedes that it has previously concluded that he was the "worst of the lot" and therefore it "simply urges the Court to consider the differences between Morris and Jones, which the Government perceives as meaningful." *Id.* at 36. Specifically, Luke Jones had no record of violence in prison, demonstrated a commitment to rehabilitation while in custody, and does not have a single disciplinary ticket while in prison. *Id.*

In reply, Mr. Morris argues that a life sentence is highly unusual, even though VICAR murder continues to carry a mandatory minimum of life. Reply at 1–3. In support, Mr. Morris notes that only 54 life sentences were issued in the last thirty years; the national average length of a sentence for murder over the past decade is approximately 22 years; and between 2010 and 2015, only .1% of youthful offenders received a life sentence. *Id.*

He also argues that "[a]lthough Congress has not yet reduced the mandatory minimum punishment for V[I]CAR murder, it also did not exclude defendants convicted of V[I]CAR murder from relief under the First Step Act." *Id.* at 4–5. Mr. Morris notes too that life sentences in other murder cases have similarly been reduced. *Id.* at 7 (citing *Rodriguez*, 492 F. Supp. 3d at 308; *United States v. Fisher*, No. 1:83-CR-150 (PAC), 2020 WL 5992340 (S.D.N.Y. Oct. 9, 2020)). Furthermore, while he does not challenge his VICAR murder conviction, Mr. Morris draws attention to the context of the various spheres of influence and conspiracies within the larger case and argues that "his role and conduct was distinct from those of other individuals convicted of V[I]CAR murder in this district," who were often leaders within their organizations and conspiracies. *Id.* at 10–14.

As to sentencing disparities, Mr. Morris further notes that, "the youngest defendant in the case known as 99[-]CR[-]264, and an individual only tangentially connected to the conspiracy in time and scope, is now serving a longer sentence than nearly all of his co-defendants, many of whom were also responsible not only for a death but for multiple deaths." *Id.* at 14. As to the disciplinary records of Mr. Morris and Luke Jones, Mr. Morris notes that Luke Jones was 30 years old at the time of sentencing and had spent the prior 15 years in and out of correctional institutions, whereas Mr. Morris was only 19 and had no prior criminal convictions. *Id.* at 15.

Like Luke Jones, Mr. Morris "has had a near-perfect disciplinary record throughout his thirties." *Id.*

On balance—though the Government raises legitimate concerns—the Court agrees.

Murder is a serious crime. The Government has powerfully argued, both in its filings and through the statements of the victim's family members, that Mr. Morris's actions deeply affected others. The lasting effects of Mr. Morris's actions are most evident in the words of Shanea Porter, Kenneth Porter's sister; Illyhundi Porter, Mr. Porter's cousin; and Dontrice Porter, Mr. Porter's nephew.

At Mr. Morris's September 15, 2003 sentencing, Shanea Porter said this about the impact of Kenneth Porter's murder on the family: "We suffer from distress, agony, torment, nightmares, and flashbacks due to his harsh, cold, cruel, horrific and terrifying—and violence, not to forget to mention the indescribable pain." Gov't Opp'n. at 31 (quoting Sentencing Hearing Tr. at 10–12, ECF No. 1515-1 (Oct. 7, 2003)).

Years later, they are still in deep pain over the loss of Kenneth Porter's life. At the First Step Act hearing on December 22, 2021, Ilyhundai Porter said this about the family's continuing pain:

> This is my nightmare. I hate this. I hate that we had to go through this. I just hope, I just hope one day maybe I could forgive [Mr. Morris], but I can't, Your Honor. I can't. Maybe it's harder for me because I seen my cousin get shot down like a dog. He looked at me and I asked him was he afraid of dying. He shook his head to me yes, and I watched blood come out of his mouth. It was so thick, Your Honor. And he died. Nobody deserve to see someone, especially a loved one, die in front of they face. I'm done, Your Honor. I've got to get off of this. Please, I got to get off of it.

Mr. Porter's nephew, Dontrice Porter, also spoke movingly about his continuing pain:

> I was seven years old at the time he took my cousin's life. I was a seven-year old child who later that night had to cradle his mother to

> sleep. For months and years I broke night cradling my mother to
> sleep . . . . I have been through therapy for this. I still go through
> therapy for this. I have experienced a breakdown because I had to
> fill the shoes of being an adult to my mother when I was a child at
> that particular moment.

No sentence – even the one originally given – can make the family of Kenneth Porter whole for their loss. And, in addition to their continuing pain, "[t]he text of the First Step Act, read in conjunction with other sentencing statutes, requires the Court to consider all relevant facts, including developments since the original sentence." *United States v. Rose*, 379 F. Supp. 3d 223, 233 (S.D.N.Y. 2019). Indeed, "[t]he principle set forth in *Pepper* [*v. United States*, 562 U.S. 476 (2011)] and § 3661 requires that the district court be able to consider the most recent evidence of a defendant's life and characteristics, which may be the most probative information available, when deciding whether a defendant should continue to be incarcerated or, in some cases, immediately released." *Id.* at 233–34. In deciding whether to reduce Mr. Morris's sentence, the Court must also consider the § 3553(a) factors, and having done so, this Court finds that they weigh in favor of a sentence reduction.

As the Government has acknowledged, Luke Jones, the leader of the drug distribution ring, has been considered the "worst of the lot," *Jones*, 2020 WL 2791862, at *3 (outlining Judge Nevas's recognition at sentencing of Mr. Luke Jones's role in the ring and the effect that his crimes had on the Bridgeport community), but his four life sentences were reduced to a term of years, specifically 450 months, *id.* at *1–2. Given Mr. Morris's age at the time of his crimes, his subsequent growth, the Court's previous reductions of sentences of others in the same related conspiracy, the precedent within the Circuit for reducing life sentences for serious crimes, *see, e.g.*, *Rodriguez*, 492 F. Supp. 2d at 308 (reducing a life sentence for participation in a "brutal

murder" to a term of years), as well as Mr. Morris's subordinate role in the conspiracy to Luke Jones, Mr. Morris's sentence should be reduced to a term of years less than 450 months.

In light of all of the factors discussed above, including but not limited to the seriousness of his crime, Mr. Morris's four concurrent life sentences shall be reduced to a sentence of 360 months, a sentence consistent with the broad remedial purpose of the First Step Act. *See* First Step Act, H.R. Rep. No. 115-699 at 22 (2018) ("The federal prison system needs to be reformed through the implementation of corrections policy reforms designed to enhance public safety by improving the effectiveness and efficiency of the federal prison system in order to control corrections spending, manage the prison population, and reduce recidivism.").

This reduction takes into consideration all of Mr. Morris's relevant criminal conduct as well as his rehabilitation efforts since these crimes. It is sufficient but not greater than necessary to serve the purposes of a criminal sentence. *See* 18 U.S.C. § 3553(a) ("The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in (paragraph 2) of this subsection.").

## IV. CONCLUSION

For the reasons explained above, the motion for reduction in sentence under the First Step Act is **GRANTED**. Mr. Morris's term of imprisonment is reduced to **360 months**.

Accordingly, the Court **GRANTS** Mr. Morris's motion; **ORDERS** that Mr. Morris's sentence of incarceration be **REDUCED** to **360 months**; and **RE-IMPOSES** a term of supervised release of **FIVE (5) YEARS**.

**SO ORDERED** at Bridgeport, Connecticut, this 26th day of August, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE